## McCLANAHAN vs. PORTER.

1. Where lands have been aliened during the life of the husband, the widow is entitled to dower in such lands, according to their value at the time of the alienation, and not according to the increased value of the land since the alienation, by means of the labor or expenditures of the alienee.

2. Where lands, of which the husband died seized, descend to the heir, the widow is entitled to dower according to their value at the time of the assignment, with damages for their detention from the death of the husband.

3. A purchaser of lands under execution against the husband, occupies the same position as the alienee of the husband.

4. Where lands aliened by the husband have depreciated in value from any cause, the widow is entitled to dower according to the value at the time of the assignment of dower.

5. So where lands have increased in value from extrensic causes not connected with the labor or expenditures of the alienee, the widow takes according to the value at the time of the assignment.

6. Although the widow gains nothing by the improvements of the alienee, she suffers loss by his waste or neglect depreciating the value of the property—this "good rule" *not* "working both ways."

7. The widow is neither tenant in common nor joint tenant with the heir or alienee. She has only a right in action until dower assigned.

8. The widow is entitled to damages, not as of any particular period, but as of the value of the property at the different periods in which she is deprived of her dower. In the case of the heir, from the death of her husband—in the case of an alienee, from the time of her demand until the assignment of dower.

9. In estimating the damages, the jury are to consider the value of the property, not merely up to the institution of suit, but up to the trial.

## APPEAL from Morgan Circuit Court.

HAYDEN, *for Appellant, insist:*

1. That the plaintiff gave no evidence to the jury to show that the said William C. Porter, in his lifetime and *during her coverture* with him, was seized of such an estate in the lands, &c., which were purchased by the defendant under execution, as entitled her to dower therein, or to damages, &c., for not having assigned the same therein; but, on the contrary, the only evidence given by the plaintiff to the jury is, that Green L. Douthit, as sheriff of Morgan county, levied certain executions issued upon judgments of the Morgan Circuit Court against said Wm. C. Porter, N. Porter, and Jefferson Porter, upon the lands mentioned in the deeds from him as sheriff, and

-sold the same to John McClanahan, as the property of *all* the defendants in said executions, and not as the property of said William C. Porter *alone*, so that it does not appear *what estate* the said William C. Porter had in the land when defendant purchased it; whether it was an estate in fee for years, at will, or at sufferance; nor that the plaintiff *was the wife* of said Wm. C. Porter when the defendant purchased the land; and consequently the jury found against law and evidence, and their finding ought to have been set aside and a new trial granted.

2. That the court erred in permitting the plaintiff to give evidence to the jury conducing to show the value of the mills and premises at the time the same were purchased by defendant, and thence down to the institution of this suit; because, among other things, the proof was calculated to mislead the jury, being wholly irrelevant to the issue. See 5 Serg. & Rawle, 289, 290, 291 and following; 3 Mason's Rep. 374–5, Powell and wife vs. the Monson and Brimfield Manufacturing Co.; see 4 Kent, 68, 67, 66, 65, &c.

3. That the court erred in not permitting the defendant to prove that he did not *in fact* deforce or oust the plaintiff from her dower in the land, and that she might have gotten it without suit, (if she were entitled to any) by showing, as he offered to do, by testimony, that from the time he took the possession of the mills, down to his abandonment of the possession thereof, he offered to, and requested the plaintiff, not only to join him in the possession and occupancy of the same, but also requested her to call and get at the mills, from time to time, as the same were produced thereby, more than her just proportion of the rents and profits thereof. See Digest 1835, sec. 16, page 228; sec. 19, 23, 24; 4 Kent, 369, 370.

4. That in this case the plaintiff cannot recover damages from the defendant by reason of his occupancy of the mills, unless he deforced the plaintiff of her dower therein, either by denying her right thereto, or by refusing to permit her to enjoy the same as a tenant in common with him. That the plaintiff in this case, if interested at all in the lands, &c., is interested as tenant in common with him, holding an estate for life, whilst he is tenant in fee; and that thus standing related or interested in the estate as tenants in common, he had the right to the enjoyment of the whole of it unless denied him by his co-tenant, by her demand of her share, and his refusal thereof to her.— That one tenant in common, who is in possession of the estate, is not bound to pay *rent*, either in the shape of the product of the estate or in money, to his co-tenant—each having his undivided right to the possession of the whole estate; and hence it is, that upon principle, neither can demand that one shall be a tenant to hold under the other and pay rent against his will and consent for the enjoyment of that of which he is legally possessed *in his* own right. 4 Kent, 36, 370-1; 12 Mass. R., 149, 150, &c.; Eben Parsons adv. Ignatius Sargeant, Coke Lit., 200, (b.)

5. That the plaintiff in this case had no right as tenant in common with the defendant or otherwise to demand or have damages of the defendant (even though he had remained in the possession of the mills from the time of instituting the suit down to the finding of the jury) for his possession thereof for the time, if the same were valueless on account of their being out of repair and unfit for use, unless the same were occasioned by the tortious acts of the defendant. That, upon principle, his possession in such case is legal, and of which the plaintiff could not complain, and therefore, unless by *his tortious* acts he renders the estate unfit for occupancy or for enjoyment, (thereby *indirectly* denying the use thereof to his co-tenant,) he is not responsible in damages.— See the following authorities: 12 Mass. Rep., 68, 69, 70, &c., Elisha Doan vs. Daniel Badger; 4 Mass. R., 574-5, &c., Edward Long vs. Sarah Bacon; see 5th vol. Serg. & Rawle Rep., 289, 290, 293, Thompson vs. Morrow.

6. The appellant will insist that the Circuit Court ought ought to have given all and every the instructions to the jury as prayed for by defendant, and that the court erred in giving to the jury those which were given to them at the instance of the plaintiff; and also that the Circuit Court ought to have set aside the verdict and have granted defendant a new trial.

NAPTON, J., *delivered the opinion of the Court.*

This was a suit for dower brought by the appelle, Betsey Porter, in the Circuit Court of Kinderhook county, but afterwards removed to the county of Morgan, and there decided. The petition charged that the petitioner was deforced of her dower in a small tract of land in Kinderhook county, upon which there was a saw and grist mill. A plea was filed and an issue made up, which resulted in a judgment by the court that the petitioner be seized of her dower in said lands, and commissioners were appointed to assign the dower. These commissioners reported that the lands were not susceptible of division, being only valuable on account of the mill which was erected on them. A writ of enquiry was then awarded, and a jury was summoned to ascertain the yearly value of the plaintiff's interest, and to assess the damages she had sustained by reason of the deforcement. Upon this trial, it appeared that this tract of land, with the improvements upon it, had been sold in the lifetime of W. C. Porter, the husband of the petitioner, by virtue of two executions against him, and had been purchased at said sale by the defendant, McClanahan. It appeared, from the testimony introduced by both parties, that this mill, partly in consequence of back water from the Osage during the great freshet in that river in 1844 and 1845, and partly from inattention to repair on the part of McClanahan, had become almost or entirely valueless, and the principal part of the testimony on the part of the plaintiff seemed designed to show that this deterioration in value had been occasioned by the negligence of McClanahan, whilst testimony was offered in behalf of McClanahan to show that it was not by any fault of his that the property had become valueless. The defendant also proposed to prove that after the death of Porter, the husband of plaintiff, he had requested and urged the plaintiff to join him in the occupancy of the said mill, or to call at the mill from time to time for her proportion of the rents and profits of the same, but this proof was excluded by the court. The court instructed the jury:

" That in assessing the plaintiff's damages, they must estimate the property named in the petition according to one-third of the yearly value thereof at the time of the purchase of the same by the defendant, taking into consideration any deterioration in the yearly value thereof from the time of the alienation down to the time of the commencement of this suit, if such deterioration was not caused by any act or negligence of the defendant; and that they should also assess the damages according to one-third of such value from the time of the commencement of this suit to the time of this verdict." But the jury were directed, in fixing the

yearly value of the property, not to consider any deterioration in the value of said property from any cause whatever which accrued after the commencement of this suit.

Several instructions were asked by the defendant, the object of which was to get an opinion from the court that McClanahan was not responsible for negligence in the management of this property, but that the plaintiff must loose from deteriorations in the value of the property, from whatever cause they originated, provided they were not occasioned by the wilful destruction or gross negligence of the defendant. These instructions were refused, and the damages were assessed under the instructions of the court above stated. The proper steps were taken to save exceptions to the opinions of the court, and the case brought here by appeal.

It is well settled that where lands have been aliened during the lifetime of the husband, the widow is entitled to dower in such lands according to their value at the time of the alienation, and not according to the increased value they may have acquired since the alienation by reason of the labor or expenditures of the alienee. This rule is however an exception to the general rule on the subject, and has been made to favor the alienee, and place him in a more advantageous position than the heir. It has been adopted on principles of public policy, being calculated to promote the interest of the alienee, and at the same time not impairing the just rights of the widow. The general rule, which applies to all cases where lands descend upon the heir, the ancestor dying seized thereof, is that the widow is entitled to her assignment of dower in the lands of her deceased husband, according to their value at the time of the assignment, with damages for their detention from the time of the husband's death. This is the rule of common law as modified by the statute of Merton, and is the rule adopted by our statute.

Most, if not all of the cases which have been adjudicated, touching this question, have been cases in which the value of the land has appreciated since the death of the husband. In these cases, the distinction has obtained to which we have just alluded. The present is a case in which the land has depreciated in value since the death of the husband, and the only question is whether, in assessing the damages and in assigning the dower, this depreciation is to be considered; whether it has arisen from extrinsic or collateral causes, or from any act or negligence upon the part of the alienee. We assume that the purchaser at the sheriff's sale during the lifetime of the husband stands in the same attitude with the husband's alienee, and whatever principle may be established in re-

lation to one, will govern the rights and interests of the other. It is conceded in the instructions which the Circuit Court gave to the jury, and we presume the position is undeniable, that where the depreciation has arisen from natural or artificial causes, apart from any acts or omissions of the alienee, he is not responsible for the loss to the widow, but she must be endowed according to the value of the lands at the time of the assignment, depreciated as they are since the death of the husband. But where the depreciation has been occasioned by acts or omissions of the alienee, the Circuit Court held, that the dowress should not suffer by such depreciation, but that the alienee should be responsible for the same, and the assignment should be made without reference to such depreciation. We think this distinction is unfounded. We know of no principle of law or of natural justice which will hold the alienee responsible for a depreciation arising from causes of this character, any more than for such depreciation as arises from extrinsic and collateral causes.

It has been determined in some of the courts, that in the case of an alienation by the husband, the widow shall be entitled to dower according to the increased value of the property, where such increase of value has arisen from extrinsic causes, disconnected with the labor or expenditures of the alienee. The converse of this proposition is also true, that where the property has depreciated from similar causes, the widow shall only be entitled to dower according to such depreciated value. So it has been uniformly held, as we have before stated, by all the courts, that the widow shall not be entitled to avail herself of the improvements made by the alienee. But the converse of this last proposition is not necessarily true. The familiar adage, applicable however rather to mathematical reasoning than to legal disquisitions, that "it is a bad rule which will not work both ways," will not settle this question. Because a direct proposition is true, it does not always follow that the converse of it is equally so. The rule which deprives the widow of the benefit of improvements made by her husband's alienee, is a rule established for the benefit of the alienee. It is an exception to the general rule on the subject. It does not follow that because the widow shall derive no benefit from the improvements made by the alienee, she shall not therefore lose by his waste or mismanagement. The rule was solely to favor the alienee, and the protection of the interests of the widow against devastations was left to another principle more powerful and more safe than any legal rule which could have been established. I mean that of self interest.

Let us take the case of the heir, and see how the widow's interests are protected. In this case, the widow has her dower assigned according to

the value of the lands at the time of the assignment. Whatever may be the condition of the estate, whether it has improved by the good management and judicious expenditures of the heir, or has appreciated by the rise of lands in the neighborhood, or from any other cause, she takes her proportion in the condition in which it is found at the time of assigning her dower. So if the lands have depreciated, either from the decline in the value of land generally, or from gross mismanagement and waste of the estate by the heir, the same rule of assignment must be observed. The heir is tenant in fee, and not responsible for waste. Even a tenant in tail was not responsible for waste. 1 Cruise Dig., p. 60, sec. 32. The widow is not a tenant in common with the heir; her right rests in action only, and at the common law, after the expiration of her quarantine, the heir could expel her and put her to her suit. Jackson vs. O'-Donaghy, 7 John. Rep., 247. The dowress takes in severalty, and is neither a joint tenant nor a tenant in common with the heir. Coke Lit., fol. 35, b. If the heir thinks proper to cut down all the timber, or pull down all the houses on the estate, such devastation will not be taken into consideration in the assignment of the widow's dower. I allude not now to the question of damages, for no question of that sort arises in this case, but to the rule of assignment. If we revert to the original mode of assigning dower, which was by metes and bounds, it becomes obvious that this assignment must take place without reference to any injury the estate may have received from the heir. The question of damages in such case would be another question. As the widow is entitled to damages from the time of the death of her husband, where he has died seized, these damages would of course be proportioned to the actual value of her dower at the different periods from the death of the husband to the institution of the suit or the time of assignment. This is the rule laid down by our statute, which says that these damages shall be " the value of the whole dower to her belonging, from the time of her husband's death." And this was the rule recognized by the court in the case of Rankin and others vs. Oliphant, 9 Mo. Rep., 239. In the present case, the widow was only entitled to damages from the time of giving notice of her claim, and as no notice was given, except by commencing suit, and the assignment of dower was considered by the Circuit Court as relating back to that period, the same value which regulated the assignment would, according to the principles adopted by that court in relation to the time at which the value of the property was to be estimated, be the rule for estimating the damages from the commencement of the suit down to the finding of the jury.

If, then, it be the law that, as against the heir, the widow would take her dower according to the value of the land at the time of the assignment, however much it may have depreciated in value since the death of her husband, and from whatever causes this depreciation may have arisen, can it be that the alienee of the husband is in a worse condition than the heir ?  We have seen that in one respect an exception has been made to favor him.  Is there any principle of law or of natural justice whice requires an owner of lands to improve them or to make such repairs as may prevent an estate from going to waste ?  Is not this wisely left it that sense of self interest which usually governs men in the management of their own affairs ?  The heir and alienee have an interest proportioned to that of the widow, we will suppose, of at least six to one.  Whatever impairs the value of the estate, necessarily injures the interests of the heir or alienee in a much greater proportion than that of the widow. The law did not intend that a jury of twelve men, however impartial they might be, should decide for a land owner what disposition he should make of his property.  The circumstances of the present case would be sufficient to show the impolicy and impropriety of such interference.— Here is a small tract of land, whose whole value arises from a saw and grist mill erected on it, driven by water power.  The value of such property depends, as every day's observation shows, on a variety of circumstances, some of which are beyond the control of the proprietor.— The stability of the dam—the constancy of the water course—the mechanical skill of the owner, are frequently all necessary to make such erections profitable in this country, and in a sparsely settled region; and in the vicinity of the Osage or Missouri, whose waters are sometimes raised to such a height as to fill up, and even overflow for months in succession, the small streams which are tributary to them, all these circumstances combined are insufficient to secure a profit to the mill owners.— Shall a jury, in such a case be permitted to determine for the proprietor whether it is his interest or not to keep his mill in repair, or whether he may abandon it as useless and unprofitable ?  This is a matter for the proprietor himself to decide.  He might have used the mills or suffered them to rot down, or convert the timbers into fire wood, as he thought best for his interests.  This right he acquired by the purchase of the estate.  He is certainly responsible in damages to the widow from the time of her demand, but these damages would be exactly proportioned to the value of her dower from the time of demand to the time of assessment. It would not affect his rights to make such alterations in the nature or value of the property as he might think best.

These considerations suggest another question, which, though it was not raised or discussed in the case here, may yet require notice. The Circuit Court directed the jury not to take into consideration any deterioration of the property after the commencement of the suit, no matter from what causes it originated. I do not know that there was any proof of a material change in the value of this property after the commencement of this suit, so as to make this question important in the final determination of this case, but cases might arise in which such a question would be very important. It seems to have been the opinion of the court, that the assignment by the jury related back to the commencement of the suit, and the witnesses would only be permitted to speak of the condition of the property at that time. This unquestionably is the practice in suits at law ordinarily, yet I am unable to see the propriety of adopting it in a suit for dower. If the assignment be made by metes and bounds, as it must be where it is practicable, do the jury, who make such assignment, make it with reference to any other condition of the land than the one in which they find it at the time they are making the assignment? I presume not. The substitution then of an estimated amount of yearly value for a specific allotment of a portion of the land, must be governed by the same principles which regulate the specific assignment in land. If, after the commencement of the suit, and before the time of the trial, the buildings on the premises are destroyed by fire, would the jury be authorized to consider the value of these buildings in their assessment? In fixing the damages, they would of course consider the value of the buildings until the period of their destruction, but not beyond that; and if, in the assignment of dower, either by metes and bounds, or by the statutory substitute of money, they take the value of these destroyed buildings in their estimate, they cannot be said to assign *one-third* of the lands to the widow, but some other proportion. The widow has nothing but a right in action until dower is actually assigned to her; she cannot maintain ejectment before an assignment. Jackson vs. Vanderheyden, 17 John. R., 167. The idea that she is availing herself of the process of the court, for the purpose of recovering the possession of land to which she has *title*, is a mistaken one. She is tenant in dower after her dower is assigned, and not until then. As the jury are required to view the premises in person, and lay off her proportion in metes and bounds, they must do so with reference to their value at the time this personal inspection and examination is made, and not with a view to its value months or years before, when the suit for dower was instituted. If the contrary were the law, then the jury must have wit-

nesses before them for the purpose of ascertaining what amount of injury had been done the estate, either by the acts of God or of the tenant.— But no such authority has been given to the jury by our law, and it is therefore evident that no such action was contemplated. And surely the same principle which governs the jury in laying off the widow's dower by metes and bounds, must be the rule of action for the jury which assesses in money the yearly value of that dower, after it has been ascertained that a division by metes and bounds is impracticable.

I have not referred to any authorities upon these questions, because I have found none in which the precise points were involved; but in several cases which were referred to in the case of Rankin and others vs. Oliphant, the courts seemed to assume the law to be as I have stated it. Chancellor Kent, in reviewing the state of judicial opinion on this subject, in his commentaries, though he does not consider directly the law in cases of depreciation of property, seems to assume it as settled, that the widow takes her dower according to such depreciated value. In speaking of the rules by which the alienee is favored in having his improvements exempted from the claims of the dowress, he says: "The rule is founded in justice and sound policy; and whether the land be improved in value or be *impaired by acts of the party* subsequently, the endowment, in every event of that kind, is to be according to the value at the time of the assignment, if the land descended to the heir." Again, in discussing the question whether the widow shall be entitled to the advantage of the increased value of the land arising from extrinsic and collateral causes unconnected with the direct improvements of the alienee, he says: " The allowance would seem to be reasonable and just, inasmuch as the widow takes the risk of the deterioration of the estate arising from public misfortunes, *or the acts of the party.*" It must follow that the widow is equally subjected to this risk in cases of an alienation of the land during her husband's lifetime, as where the land has descended to the heir; for if the law were otherwise, the condition of the alienee would be worse than that of the heir. Whereas it has been the manifest policy of the law to give the alienee all the advantages of the heir, and, in one important particular, to give him a decided preference.

The other Judges concurring, the judgment is reversed and the cause remanded.